(135 So. 595)

### ENZOR v. STATE.

### 2 Div. 449.

Court of Appeals of Alabama.

May 19, 1931.

Rehearing Denied June 9, 1931.

348

Harwood & McQueen, of Tuscaloosa, and Martin Miller, of Meridian, Miss., for appellant.

SAMFORD, J.

The defendant was indicted jointly with Dan and Horace Shamburger for the murder of Berry Brown. A severance was demanded and this defendant was tried separately.

On February 5, 1929, Berry Brown was last seen alive by his brother, Will Brown, in the morning about 8 or 9 o'clock at Yellow Bluff on Morgan branch near the Tombigbee river. On April 16th afterwards, the body of Berry Brown was found about six miles below among some snags in the Tombigbee river and in Marengo county. The body was so badly decomposed as to be hardly recognizable as a white man, but was identified by the clothing and a belt. There were two wounds on the body,—one in the mouth evidently made with a load of small shot, and the other in the hip made with a pistol or rifle bullet. There was evidence tending to prove that between 11 and 1 o'clock, three shots were heard in the direction of the old Shamburger mill site, where the evidence for the state tended to prove Berry Brown was shot. The first shot was fired from a rifle and the next two from a shotgun. The parties hearing these shots were from a quarter to half a mile away. There was some evidence tending to prove that on February 5th, between 11:30 and 2 o'clock, Dan and Horace Shamburger, and another party not identified, were seen on the public road leading from Pennington to Lock 2, in an automobile and going in the direction of Lock 2; that between where they were seen and Lock 2 was a side road leading to the Shamburger mill site; and that the automobile never came to Lock 2 on that day. James Turner, a negro laborer in the employ of Dan Shamburger, testified that he was in the creek swamp near the mill site cutting fence posts; that he got to his work about 7 o'clock; that he was working about two quarters (one-half) mile from the mill site

Thos. E. Knight, Jr., Atty. Gen., Jas. L. Screws, Asst. Atty. Gen., and Joe. M. Pelham, Jr., of Chatom, for the State.

where he afterwards saw the dead body of Berry Brown; that he had cut and split thirty-five posts, when he heard some gunshots in the direction of the mill site; that in twenty-five or thirty minutes Dan and Horace Shamburger came up to where he was at work; that he quit his work and went with them in the direction · from which he had heard the gun fire, and after going some distance and to a point near the mill site he saw the dead body of Berry Brown, lying on the ground near a pool of fresh blood; that Grady Enzor was standing near with a single-barrel shotgun in his hand; that when he came up to the body, Dan and Horace said they wanted witness to help cover the blood and move the body; that he moved the body "against a log there next to the mill place to keep the body from being found"; that Tuesday night, he and Morris Chaney, another negro in the employ of Dan Shamburger, in company with Dan, Horace, and this defendant, went to the body in a truck; that he and Chaney loaded the body on the truck, which Dan drove, and they carried it some distance north and put it in a tree top and hid it; that on Thursday night they all went back to the body; that under the instruction of Dan, he and Chaney picked up the body and carried it through the swamps and swamp roads about a mile to Ticabum creek, when they put it down; that they were then told to go; that then Dan, Horace, and defendant tied some iron weights to the body and the three threw it into the creek, about six miles above the point where it was finally found. Except as to the first time that this witness saw the body, the foregoing testimony was corroborated by Morris Chaney. These negroes were first arrested charged with the crime and placed in jail. They first said they knew nothing about the murder, but later testified for the state implicating, as the murderers, the three white men, as above outlined. There was much evidence tending to impeach the testimony of James Turner and Morris Chaney. No motive was shown for the crime, and this defendant, as well as the two Shamburgers, offered evidence tending to prove a complete alibi.

■ Over the objection of defendant, the state's witness Mrs. Burnett was allowed to testify that between 11:30 and 1 o'clock February 5th she had seen Dan and Horace Shamburger riding in a large automobile in the public road passing her house and going in the direction of Lock 2, and in the same car on the back seat was another man whom she could not identify. State's witness Kelly, a brother of Mrs. Burnett, was allowed to testify that between 12 and 2 o'clock on the same road and two miles nearer Lock 2, he saw Dan and Horace pass in an automobile going towards the Lock, with some one sitting on the rear seat, but whether this person was white or

black he could not tell; that in thirty-five or forty-five minutes thereafter he heard two guns shoot in the general direction of Dan Shamburger's field, which was also in the general direction of the place where the homicide was alleged to have been committed. There was a road leading from the public road on which Kelly saw the car, in the direction of the mill site, and this road branched off between Kelly's and Lock 2. In other words, the car in which were the Shamburgers and the defendant might have proceeded along the public road towards Lock 2 and turned off into a side road going through Dan's field to the mill site. On February 5th the sun rose at 7:11 a. m. Turner began work one hour after that and had cut and split thirty or thirty-five posts when Dan and Horace came to him. He had heard the gun shots thirty or forty minutes before that time. Turner had no time piece, nor did Mrs. Burnett or Kelly. None of these witnesses were certain as to time, and all of this testimony was the mere expression of opinion without any definite basis upon which to fix the opinion, but there was a continuity of circumstances beginning with the testimony of Mrs. Burnett and ending with the dead body of Berry Brown at the old mill site, tending to connect this defendant with the crime. All evidence which legitimately tends to show that the defendant had the opportunity of committing the crime charged is admissible as going to establish his connection therewith. The crime here charged was committed in secret and it is only by proof of facts and circumstances from which logical conclusions may be drawn by the jury that a correct verdict may be reached. For that reason, while there is a limit, every fact or circumstance tending to connect the defendant with the commission of the crime is relevant. 8 R. C. L. p. 179, par. 172; Lancaster v. State, 21 Ala. App. 140, 106 So. 609; Smith v. State, 133 Ala. 145, 31 So. 806, 91 Am. St. Rep. 21.

■ The clothing or fragments of clothing and the leather belt found on the dead body were admissible in evidence for purposes of identification. The Boyette Case, 215 Ala. 472, 110 So. 812, and other cases cited, are not in point.

■ The iron weights, found near the point in Ticabum creek where state's witnesses said the body had been thrown after iron weights had been tied to it by Dan Shamburger, aided or abetted by defendant, were properly admitted in evidence as tending to corroborate the testimony of Turner and Chaney.

■■ Assuming for the purposes of this decision that there was sufficient evidence of a conspiracy between the two Shamburgers and this defendant to admit in evidence the acts and declarations of each in the consummation of the common purpose or design during the pendency of the conspiracy, after the

350

crime is committed, the acts and declarations of the two Shamburgers on February 6th, being the day after the homicide was committed, in the absence of this defendant, were not a part of the res gestæ and not binding on him. Therefore, all that testimony as to what the Shamburgers did and said on February 6th is in no way connected with this defendant and could not have been introduced as facts tending to prove defendant's guilt. Leverett v. State, 18 Ala. App. 578, 93 So. 347; Durden v. State, 18 Ala. App. 498, 93 So. 342; Hunter v. State, 112 Ala. 77, 21 So. 65. But, this testimony was brought out on the cross-examination of Horace Shamburger and, under the rule allowing a wide latitude in cross-examinations, was admissible for the purpose of testing the accuracy of the testimony of Horace as to dates, time, events, and the like. The court did not err in its rulings on this point.

■■ It was in evidence that defendant was seen at the dead body of Berry Brown on the morning of February 5th, with a single-barrel shotgun. It was therefore relevant to prove that at about 6 o'clock on that day he returned a single-barrel shotgun to the party who owned it, being a circumstance tending to prove that he had a single-barrel shotgun in his possession. The explanation as to when he came into possession of the shotgun was defensive matter to be considered by the jury.

■ Testimony tending to prove that Berry Brown had, in December before the homicide, borrowed a worm for a whisky still from defendant, that defendant had tried to get it back and failed, and that he was hunting for it, was a circumstance, however slight it may be, tending to prove a motive for the killing and as such was admissible. Overstreet v. State, 46 Ala. 30.

■ The vice of refused charges "d" and "e" lie in the fact that they instruct the jury that the testimony of Judge Lindsay, a witness for the defense, is true and that that of James Lindsay and Morris Chaney is false. This is invasive of the province of the jury.

■ Refused charge 3 pretermits a consideration of the evidence, and for that reason is bad.

■ Refused charge 21 was covered by the general charge and by written charges.

■ Refused charge 28 was abstract; there was no evidence tending to prove that either James Turner or Morris Chaney were accomplices.

■ It is always relevant to prove flight on the part of the defendant after the commission of a crime. In doing this, the fact of leaving the community, the circumstances under which he left, where he went to, whether he left secretly or openly, are relevant. It then becomes a question for the jury to say whether the leaving was in fact a flight due to a consciousness of guilt or the exercise of a right to which he is legally entitled.

The foregoing covers the specific objections and insistences of error in appellant's brief, in addition to which we have examined the various rulings of the trial court on the admission of evidence and the refusal of written charges, all of which we find free from prejudicial error.

■ The facts tending to connect this defendant with the crime are entirely circumstantial, and present a question for the jury.

We find no prejudicial error in the record, and the judgment is affirmed.

Affirmed.